UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

**FILED**

AUG 3 1 2016

CLERK

JENNIFER LYNN STOCK,

Plaintiff,

vs.

BNSF RAILWAY COMPANY, A
DELAWARE CORPORATION,

Defendant.

4:14-CV-04074-RAL

OPINION AND ORDER GRANTING
MOTION FOR SUMMARY JUDGMENT

Plaintiff Jennifer Lynn Stock (Stock) sued BNSF Railway Company (BNSF) after the

vehicle she was driving collided with a train parked and blocking a road at a railroad crossing.

She alleged that BNSF was negligent by violating federal regulations and internal rules

concerning train operations. Although a train blocking a road at night is a clear safety concern,

this Court must follow existing precedent to grant summary judgment to BNSF.

**I. Facts**

The accident in this case occurred in rural Yankton County, South Dakota near railroad

tracks called the NAPA Junction. Doc. 62 at ¶ 1; Doc. 83 at ¶ 1. At the NAPA Junction, a

"wye" railroad track configuration connects BNSF's main line to storage track owned and

maintained by Dakota Southern Railway Company (DSRC). Doc. 70-1; Doc. 87 at ¶¶ 3–5; Doc.

87-1 at 4; Doc. 88-2 at 6–7.[1] The wye forms a rough right triangle with the BNSF main line as

---

[1]BNSF submitted some of the evidence this Court cites in the "Facts" section after Stock
responded to BNSF's motion for summary judgment. This Court has only included the evidence
BNSF submitted after Stock's response to aid the reader in understanding the track configuration

1

the hypotenuse and the DSRC tracks as the legs. Doc. 87 at ¶¶ 3–5; Doc. 87-1 at 4; Doc. 88-2 at 6–7. The legs of the wye eventually merge into a single DSRC track running to the west of the BNSF main line. Doc. 87 at ¶¶ 3–5; Doc. 87-1 at 4; Doc. 88 at 6–7. The DSRC storage tracks, including the legs of the wye and the single track running west of the BNSF main line, are commonly referred to as the "NAPA line." Doc. 87 at ¶¶ 3–5; Doc. 87-1 at 4; Doc. 88-2 at 6–7.

Early in the morning on August 2, 2012, the train crew on BNSF train B-NAPWSP-1-01 (the train) traveled to the NAPA Junction to pick up railcars. Doc. 62 at ¶ 1; Doc. 83 at ¶ 1. Picking up railcars is a process known as "switching." Doc. 62 at ¶ 2; Doc. 83 at ¶ 2. Switching requires railroad employees to couple or connect the railcars to the train. Doc. 62 at ¶ 2; Doc. 83 at ¶ 2. When a railroad employee couples railcars to the train, the employee connects the air line between the existing train and then removes or releases the handbrakes from the railcars. Doc. 62 at ¶ 2; Doc. 83 at ¶ 2. Thereafter, the employee must conduct federally-mandated air brake tests on each railcar. Doc. 62 at ¶ 2; Doc. 83 at ¶ 2. A brake test typically requires an employee to walk along both sides of each railcar. 49 C.F.R. § 232.205(c)(2); Doc. 85-15 at 10; Doc. 85-16 at 1.

The railcars the crew picked up were on the NAPA line. Doc. 62 at ¶ 3; Doc. 83 at ¶ 3; ASMF[2] at ¶ 9; Doc. 86 at 11. Because of the terrain and vegetation alongside the NAPA line, the train crew determined that it would be safer and more convenient to perform the brake test on

---

at the NAPA Junction or where Stock herself cited the evidence but did not file it in the record. This Court has not used the evidence filed after Stock's response to resolve any matter alleged to be a genuine issue.

[2]For clarity, citations to Stock's "Additional Statements of Material Fact," which were included in the same document as her response to BNSF's statements of material fact, will be preceded by "ASMF."

2

BNSF's main line. ASMF at ¶ 6; Doc. 85-13 at 1; Doc. 85-15 at 1; Doc. 88-2 at 5.[3] Thus, once the railcars were coupled, the train crew pulled the train through the north leg of the wye and onto BNSF's main line for a distance necessary for the entire length of the train to clear the north wye switch. Doc. 62 at ¶¶ 3, 8; Doc. 83 at ¶ 3, 8. When the train stopped so the crew could perform the brake test, the train was blocking 306th Street in rural Yankton County at railroad crossing DOT No. 382269H (the crossing), which is located northwest of the NAPA Junction. Doc. 62 at ¶¶ 4, 9; Doc. 83 at ¶¶ 4, 9; ASMF ¶ 4; Doc. 88-2 at 6. A BNSF employee testified that the crew planned to back the train up off the crossing to perform the test.[4] Doc. 85-15 at 2; Doc. 88-2 at 4. Approximately one minute after the train came to a complete stop, however, Stock, who was driving her car eastbound on 306th street, drove into a railcar blocking the crossing. Doc. 62 at ¶¶ 10, 13; Doc. 83 at ¶¶ 10, 13. The accident occurred at around 4:56 a.m. Doc. 62 at ¶ 10; Doc. 83 at ¶ 10. Stock suffered injuries, including broken ribs and a broken leg. Doc. 85-12 at 1.

Stock sued BNSF, claiming they were negligent by:

> a. failing to keep it's [sic] train under reasonable and proper control by stopping and parking a flatbed car spanning [the crossing] on rural 306th Street in Yankton County, South Dakota, under cover of darkness without need for such stoppage;
> b. failing to sound the train's horn prior to entering thecrossing in the manner required under federal law;
> c. failing to properly mark the flatbed car spanning the crossing with reflective material, or otherwise mark the car, in the manner required under federal law;

---

[3]BNSF filed Document 88-2, which contains some of the deposition testimony of train crew employee Ryan Schooley, after Stock responded to BNSF's motion for summary judgement. Certain pages of Schooley's testimony contained in Document 88-2 are cited above because Stock relied on the pages in her Additional Statement of Material Facts but failed to file them. See ASMF at ¶ 6; Doc. 85-13.

[4]Doing so would have blocked a different crossing to the southwest of 306th street. Doc. 87 at ¶¶ 11–12.

> d.  failing – to the extent that BNSF stopped the train with the flatbed car occupying the crossing to check the train's braking system – to comply with federal law and/or regulations, internally formulated regulations required by federal law, and/or internal BNSF policy dealing with such a stoppage;
>
> e.  failing – to the extent that BNSF stopped the train with the flatbed car occupying the crossing to conduct a crew change, rotation, or other employee-related    activity – to comply with federal law and/or regulations, internally formulated regulations required by federal law, and/or internal BNSF policy dealing with such a stoppage.

Doc. 7 at ¶ 12.

BNSF moved for summary judgment on all of Stock's claims, arguing that the Federal Railroad Safety Act (FRSA) preempted Stock's blocked crossing claim, her inadequate warning device claim, and her reflectorization claim; that her horn claim failed as a matter of law; and that the "occupied crossing doctrine" and Stock's alleged contributory negligence barred all of her claims. Docs. 60, 61. Stock opposed BNSF's motion, arguing that the FRSA's preemption provision did not apply because she was alleging that BNSF violated federal regulations and its own internal rules, that the occupied crossing doctrine did not apply in South Dakota, and that contributory negligence was a fact question for the jury. Doc. 84. Stock did not specify which of her claims escaped preemption; did not dispute the cases BNSF cited holding that the FRSA preempts blocked crossing, failure to warn, and reflectorization claims; and did not discuss her claim that BNSF failed to sound its horn before entering the crossing. Doc. 84.

## II. Discussion

### A.    Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(a) places the burden initially on the moving party to establish the absence of a genuine issue of material fact and

4

entitlement to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met that burden, the nonmoving party must establish that a material

fact is genuinely disputed either by "citing to particular parts of materials in the record" or by

"showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R.

Civ. P. 56(c)(1)(A)–(B).  In ruling on a motion for summary judgment, the facts and inferences

fairly drawn from those facts are "viewed in the light most favorable to the party opposing the

motion."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986)

(quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)).

### B.    Claims at Issue

Congress enacted the FRSA in 1970 "to promote safety in every area of railroad

operations and reduce railroad-related accidents and incidents."  49 U.S.C. § 20101.  The FRSA

gives the Secretary of Transportation authority to issue regulations governing railroad safety.  49

U.S.C. § 20103.  To ensure national uniformity of railroad safety regulations, the FRSA contains

a preemption provision that allows states to adopt or maintain laws relating to railroad safety

"until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the

subject matter of the State requirement."    49 U.S.C. § 20106(a)(1)–(2).    Congress, after

becoming dissatisfied with the way courts were interpreting the preemption provision, passed a

"clarifying" amendment in 2007.  49 U.S.C. § 20106(b); Lundeen v. Canadian Pac. Ry. Co., 532

F.3d 682, 687–88 (8th Cir. 2008).  The 2007 amendment made clear that the FRSA does not

preempt state-law claims that a railroad failed to comply with a federal standard of care

established by the Secretary's regulations or with the railroad's own rules that it created pursuant

to the Secretary's regulations.  49 U.S.C. § 20106(b)(1)–(2).

5

After the parties completed briefing on BNSF's summary judgment motion, Stock stated in a filing that she was withdrawing her "failure to warn claims," including her claim that BNSF failed to properly reflectorize the railcar she struck. Doc. 94 at 13. It is unclear whether Stock's claim that BNSF failed to sound the train horn falls within the "failure to warn claims" she has withdrawn. In any event, BNSF is entitled to judgment as a matter of law on Stock's horn claim because it is undisputed that the train crew sounded the horn before the train entered the crossing and Stock has failed to explain how BNSF sounding its horn in the manner it did violated a federal regulation. Doc. 62 at ¶ 6; Doc. 83 at ¶ 6. BNSF is also entitled to judgment as a matter of law on Stock's common law blocked-crossing claim in paragraph 12a. of her amended complaint. Stock ignored BNSF's argument based on authority from within this District that the FRSA preempts blocked-crossing claims like the one she asserts in 12a,[5] and has therefore waived any argument to the contrary. See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs., 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument."); Roy v. Lake Cty., No. CIV. 12-4070-KES, 2014 WL 3386022, at *3 (D.S.D. July 19, 2014) (holding that plaintiff had waived two claims by failing to respond to defendants' arguments that they were entitled to summary judgment on these claims).

Stock argues, however, that the FRSA does not preempt all of her claims because she is alleging that BNSF was negligent by failing to comply with 49 C.F.R. § 232.205, BNSF Air Brake and Train Handling Rule 100.10, and Rule 6.32.6 of the BNSF General Code of Operating

---

[5]In Jacobson v. BNSF Ry. Co., No. 1:11-CV-01003, 2011 WL 6099389 (D.S.D. Dec. 7, 2011), Judge Kornmann held that the FRSA preempted the plaintiff's common law negligence claim based on a train temporarily blocking a crossing because "[m]atters of train movement, including maximum speeds, are regulated by federal law." Id. at 4. Stock actually appears to agree that federal regulations cover the blocking of crossings by trains. See Doc. 84 at 15 ("Matters relating to the blocking of a railroad crossing are subsumed by federal regulations."). But see, Kiemele v. Soo Line R.R. Co., 93 F.3d 472, 475 (8th Cir. 1996) (remanding common-law blocked crossing claim to district court without discussing whether the FRSA preempted claim).

6

Rules. BNSF argues that these claims fail for several reasons, including that it did not violate any rules or regulations and that even if it did, these violations did not proximately cause Stock's injuries.

To prove negligence in South Dakota, Stock must show that BNSF owed her a duty, that BNSF breached the duty, and that BNSF's breach was a proximate and factual cause of her damages. Hamilton v. Sommers, 855 N.W.2d 855, 861 (S.D. 2014); Englund v. Vital, 838 N.W.2d 621, 627 (S.D. 2013). Proximate cause under South Dakota law means "a cause that produces a result in a natural and probable sequence and without which the result would not have occurred." Hertz Motel v. Ross Signs, 698 N.W.2d 532, 537 (S.D. 2005) (quotation and emphasis omitted). For proximate cause to exist, the injury suffered must be a foreseeable consequence of the act complained of. Zarecky v. Thompson, 634 N.W.2d 311, 316 (S.D. 2001); Wuest ex rel. Carver v. McKennan Hosp., 619 N.W.2d 682, 689 (S.D. 2000). In other words, liability cannot be based on mere speculative possibilities or circumstances and conditions remotely connected to the events preceding an injury. Mulder v. Tague, 186 N.W.2d 884, 887 (S.D. 1971). Although "proximate cause is generally a jury question, a causal relationship between the alleged [negligence] and injury is not presumed." Hamilton v. Bangs, McCullen, Butler, Foye & Simmons, L.L.P., 687 F.3d 1045, 1050 (8th Cir. 2012) (alteration in original) (quoting Burley v. Kytec Innovative Sports Equip., Inc., 737 N.W.2d 397, 409 (S.D. 2007)). The Supreme Court of South Dakota has upheld summary judgment where the injury the plaintiff suffered was not a foreseeable result of the defendant's negligence. Goff v. Wang, 296 N.W.2d 729, 730–31 (S.D. 1980) (affirming grant of summary judgment and holding that plaintiff falling from horse while attempting to round up cattle was not a foreseeable consequence of defendant allowing cattle to graze on another's land).

7

This Court first addresses Stock's claim that BNSF was negligent by violating Rule 6.32.6. Rule 6.32.6 states: "When practical, a standing train or switching movement must avoid blocking a public crossing longer than 10 minutes." Doc. 85-19. The obvious problem with basing a negligence claim on Rule 6.32.6 is that Stock drove her vehicle into the railcar approximately one minute after the train stopped over the crossing. Doc. 62 at ¶¶ 10, 13; Doc. 83 at ¶¶ 10, 13. At the time of the accident, then, BNSF had not violated Rule 6.32.6. Stock attempts to deal with this problem by speculating that the train would have blocked the crossing for an hour while the crew performed the break test. Doc. 84 at 15–18; ASMF at ¶ 15.[6] She asserts that "[l]ike the prior similar incidents rule [discussed by the Supreme Court of South Dakota in Janis v. Nash Finch Co., 780 N.W.2d 497 (S.D. 2010)], it doesn't matter that the collision took place less than ten minutes after the train came to a complete stop." Doc. 84 at 15.

Janis was a slip-and-fall case in which the Supreme Court of South Dakota rejected a landowner's argument that a lack of prior similar incidents made a harm unforeseeable. Id. at 503–04. The Court reasoned that the "prior similar incidents rule" was inadvisable because it discouraged the prevention of harm and allowed landowners "one free injury" before they could be found liable. Id. at 504. Janis and the prior similar incidents rule provide no support for Stock's assertion that the timing of the accident is irrelevant. Because BNSF had not violated

___
[6]The testimony of train-crew member Ryan Schooley is the only evidence Stock offers to support her assertion that the train would have blocked the crossing for an hour while the crew performed the break test. ASMF ¶ 15; Doc. 84 at 15. Schooley testified that it would have taken an hour to perform the break test, but Stock has not pointed to any testimony from Schooley that the train would have blocked the crossing for an hour. Doc. 84-13 at 2–3. In fact, Schooley testified in his deposition that the crew was going to back the train to the southeast off the crossing before performing the test. Doc. 88-2 at 4. In a brief to this Court addressing the admissibility of expert opinions, Stock states that Donny Dugan, a trainmaster for BNSF, "indicated that the test would take between 25 minutes and an hour." Doc. 94 at 7. Dugan, however, testified that the train crew told him they planned to clear the crossing before performing the break test. Doc. 85-15 at 2.

8

Case 4:14-cv-04074-RAL   Document 96   Filed 08/31/16   Page 9 of 14 PageID #: 1173

Rule 6.32.6 when the accident occurred, Stock's negligence claim based on Rule 6.32.6 fails as a matter of law.[7]

Even if BNSF had violated Rule 6.32.6, Stock would struggle to show that the violation proximately caused her injury under current Eighth Circuit precedent. The United States Court of Appeals for the Eighth Circuit has held that a railroad company's violation of a state law limiting the time a railcar can block a crossing to ten minutes was not the proximate cause of an accident between a railcar and a plaintiff's vehicle. Grade v. BNSF Ry. Co., 676 F.3d 680, 688 (8th Cir. 2012). The plaintiff in Grade hit a railcar stopped on a crossing while driving his car late one night during an ice storm. Id. at 682. The railroad company had violated a Nebraska statute by leaving its train blocking the crossing for longer than ten minutes. Id. at 688. The plaintiff sued, arguing that the railroad company's negligence in violating the statute caused the accident. Id. at 683. The Eighth Circuit disagreed, finding no proximate cause: "We fail to see how the natural and probable consequence of a railroad's permitting a railcar to remain on a crossing longer than the allotted ten minutes is that an automobile will collide with that railcar. As a matter of law, [the plaintiff] has failed to demonstrate causation and his claim fails." Id. at 688.[8]

---

[7]Stock's expert, Charles Culver, opines in one of his reports that BNSF violated Rule 6.32.6. Doc. 80-1 at 3. Given the undisputed evidence that Stock struck the railcar before the ten-minute time limit set forth in Rule 6.32.6 expired, the material facts not subject to genuine dispute dispel Culver's opinion and justify summary judgment on the Rule 6.32.6 claim.

[8]Other courts have held that it is a question for the jury whether a railroad company proximately caused an accident by violating a statute limiting the time a train can block a crossing. See Short v. Pa. R.R. Co., 187 N.E. 737, 738 (Ohio Ct. App. 1933); Dickey v. Atl. Coast Line R.R. Co., 147 S.E. 15, 16 (N.C. 1929). Still, the Eighth Circuit in Grade was not breaking new ground. See Fox v. Ill. Cent. R.R. Co., 31 N.E.2d 805, 808–09 (Ill. App. Ct. 1941) (concluding that railroad company's blocking of crossing for longer than ten minutes in violation of state law was not proximate cause of accident); Simpson v. Pere Marquette Ry. Co., 268 N.W. 769, 770 (Mich. 1936) (holding that railroad company's blocking of crossing beyond time allowed by statute was not proximate cause of collision).

9

Stock's remaining claim is that BNSF was negligent by violating § 232.205 and BNSF

Rule 100.10. Section 232.205 concerns the locations brake tests must be conducted:

> (a) Each train and each car in the train shall receive a Class I brake
> test . . . at the following points:
>> (1) The location where the train is originally assembled
>> ("initial terminal");
>
> . . . .
>
>> (3) A location where the train is off air for a period of more
>> than four hours . . . .

49 C.F.R. § 232.205. Rule 100.10 says essentially the same thing:

### A.   Requirement For Test

> Test must be conducted:
> - Where the train is originally assembled (initial
>   terminal).
>
> . . . .
>
> On a portion of the train as specified below:
>
> . . . .
>
> - On that portion of a train that has not been kept
>   charged. (off air over 4 hours) . . . .

Doc. 85-16 at 1. The parties disagree over whether BNSF violated § 232.205 and Rule 100.10.

Stock contends that § 232.205 and Rule 100.10 required the train crew to conduct the brake test on the NAPA line because the NAPA line is the location where the train was originally assembled and where the crew picked up railcars that had been off air for more than four hours. Doc. 84 at 11–13; ASMF ¶ 9. She asserts that BNSF admitted in separate litigation that Rule 100.10 requires a crew to perform the brake test before the train moves onto a main line. ASMF at ¶ 8; Doc. 84 at 11–13. Stock argues that BNSF violated § 232.205 and Rule 100.10 by moving the train onto the BNSF main line to perform the brake test. ASMF at ¶¶ 11–13; Doc. 84 at 11–13.

BNSF disputes that it violated § 232.205 and Rule 100.10. After Stock replied to BNSF's motion for summary judgment, BNSF filed an affidavit from Donny Dugan stating that

10

the NAPA Junction is also called the NAPA Station. Doc. 87 at ¶ 3. According to Dugan, a "station" and "terminal" are one and the same. Doc. 87 at ¶¶ 2, 9. Dugan averred that after the train cleared the northwest leg of the wye, the train crew would have pushed the train back to the southeast to perform the brake test at the NAPA Station or Terminal, but Stock collided with the railcar before the crew could do so. Doc. 87 at ¶¶ 9–10. BNSF argues that it did not violate § 232.205 and Rule 100.10 because the crew intended to perform the brake test at the NAPA Station, the location where BNSF contends the train was originally assembled. Doc. 86 at 18–21.

This Court need not decide whether BNSF violated § 232.205 and Rule 100.10 because even if BNSF did, Stock colliding with the train while it was stopped over the crossing was not a foreseeable consequence of any possible violation of the brake test standards. The purpose of a train's brake system is, of course, to allow the train to slow or stop properly. Section 232.205 is designed to ensure that a train's brake system is functioning properly when the train is traveling on the tracks. See 49 C.F.R. § 232.1(a) ("This part prescribes Federal safety standards for freight and other non-passenger train brake systems and equipment."); Brake System Safety Standards for Freight and Other Non-Passenger Trains and Equipment; End-of-Train Devices, 66 Fed. Reg. 4,104, 4,149 (Jan. 17, 2001) (explaining that the brake provisions were designed to protect against conditions such as crossings, steep grades, and limited engineer sight distance that may create a greater need for power brakes during train movement). To this end, § 232.205 requires that railroad companies conduct Class I brake tests at certain locations. These testing locations include the place the train is originally assembled (presumably because the train has yet to undergo a Class I brake test) and places where, for certain reasons, the brake system may no longer be functioning properly. See, e.g., 49 C.F.R. § 232.205(a)(3) (requiring brake test at a

11

location where the train has been off air for longer than four hours); see also Brake System Safety Standards for Freight and Other Non-Passenger Trains and Equipment; End-of-Train Devices, 66 Fed. Reg. 4,104, 4,121–23, 4,168 (Jan. 17, 2001) (discussing rationale for requiring break tests after train has been off-air). Nothing in the text or legislative history of § 232.205 suggests that the brake testing locations listed in § 232.205 were chosen because tests conducted at these locations are less likely to block railroad crossings. See 49 C.F.R. § 232.205; Brake System Safety Standards for Freight and Other Non-Passenger Trains and Equipment; End-of-Train Devices, 66 Fed. Reg. 4,104 (Jan. 17, 2001).

When a railroad company fails to comply with § 232.205, it is foreseeable that the train's brakes will not function properly and an accident will occur because the train could not stop or slow down. The harm Stock suffered—colliding with a train stopped over a crossing—was not one of the harms that the crew risked by allegedly violating § 232.205. That is, it was not foreseeable that violating § 232.205 by moving the train onto BNSF's main line to conduct a brake test would result in a motorist colliding with a railcar while the train was stopped over a crossing. The Eighth Circuit's decision in Grade supports this conclusion; if a car colliding with a stationary train at a crossing is not a foreseeable harm of violating a statute prohibiting blocking a crossing beyond ten minutes, then a car colliding with a stationary train at a crossing is most certainly not a foreseeable harm of a train crew violating a regulation concerning brake function and having nothing to do with blocked crossings.

Stock asserts that the reports from her expert Charles Culver demonstrate that BNSF's violation of § 232.205 and Rule 100.10 proximately caused her injuries. Doc. 84 at 14, 17. In Culver's first report, he states:

> This brake test should have been performed in a location where public roadways would not be blocked for an excessive amount of

12

> time. Had this brake test been performed while the train was still
> in the yard,[9] or at least clear of the crossing, the dangerous
> conditions of empty flat cars without reflective markers, stopped at
> a passive crossing in hours of darkness, would not have existed;
> thus, the collision would have been avoided.

Doc. 80-1 at 4. Culver's second report contains a similar statement: "Had this brake test been performed in the storage yard where the train was made up, and not on the main line blocking a public crossing, the crossing would not have been blocked at the time of the incident, thus the collision would have been avoided." Doc. 89-1 at 4. Culver's opinions are that the train crew's alleged violations of § 232.205 and Rule 100.10 were the factual cause of the accident, but they do not advance Stock's claim that the violation proximately caused her damages. In other words, while Culver's reports state that the train would not have been blocking the crossing at the time Stock drove into it if the crew had performed the brake test on the NAPA line, the reports do not create a question of fact concerning whether a car colliding with a stationary train is a foreseeable harm of violating § 232.205 and Rule 100.10.[10] BNSF is thus entitled to judgment as a matter of law on Stock's claims based on § 232.205 and Rule 100.10.

---

[9]It appears from reading Culver's deposition that he uses the term "yard" to refer to the NAPA line. Doc. 93-1 at 9.

[10]Indeed, there is evidence in the record that, even if the train crew had been able to back the train to the southeast off the crossing, then the train would have blocked a crossing on 437th avenue near the NAPA junction during the brake test. Doc. 87 at ¶¶ 11–12. Further, there is evidence in the record that if the train crew had pushed the train northwest off the crossing, then the train would have blocked a crossing on 436th avenue and/or a crossing on 305th street. Doc. 87 at ¶¶ 11–12. Culver stated in his first expert report that "there was sufficient room to pull the train between the crossings at 304th and 305th Streets, where there was over 6,000 feet of clearance. At this location a brake test could have been performed without blocking any crossings, and this type of procedure is a common practice in the industry." Doc. 80-1 at 4. Stock includes this statement from Culver as a material fact. ASMF ¶ 16 ("The train crew could have performed the brake test at the crossing at 304th street and 305th streets, which would not have blocked any crossings."). To get to the location between 304th and 305th streets, the train crew would have had to push the train much farther to the northwest away from the NAPA junction, which would put the brake test at a location in violation of § 232.205 and Rule 100.10. As for performing the brake test on the NAPA line, Schooley testified that when the crew arrived

## III. Conclusion

Following controlling precedent and for the reasons stated above, it is hereby

ORDERED that Stock's Motion to Extend Deadlines, Doc. 79, is granted as the Court has considered all of Stock's filings. It is further

ORDERED that BNSF's Motion for Summary Judgment, Doc. 60, is granted. It is finally

ORDERED that BNSF's Motion to Exclude Testimony of Charles Culver, Doc. 91, is denied as moot.

DATED this 31st day of August, 2016.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

---

to pick up the railcars on the NAPA line, the cars were in two segments, with some cars located to the east of a crossing on 436th street and some cars located to the west of the crossing on 436th street. Doc. 88-2 at 2–3; Doc. 88-2 at 6. Dugan stated in his second affidavit that "[e]ven if it was safe and practical to perform the Class 1 air brake test on the [NAPA line], once the two segments of cars were coupled, the train would have necessarily had to block 436th Avenue while the train crew performed the test because of the train's overall length." Doc. 87 at ¶ 7. Culver agreed in his testimony that if the train crew had performed the test on the NAPA line with all of the railcars coupled as one train, the train would have blocked a crossing on the NAPA line. Doc. 93-1 at 9–10. Culver also testified, however, that the train crew could have performed the brake test on the NAPA line without blocking a crossing there if they had cut the cars over the crossing and then connected the divided segments with an air hose. Doc. 93-1 at 9–10. Culver opined that performing the test in this manner would have been in compliance with federal regulations. Doc. 93-1 at 10. This Court need not resolve whether there was a way for BNSF here to do a legal brake test in the area without blocking a crossing, because of the absence of proximate cause connecting a misplaced brake test with this accident.

14